UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

EVERETTE L. BLACK, JR.,

                Plaintiff,

v.                                    Case No. 3:22-cv-298-BJD-LLL

SGT. R. MOLINSKI and
SGT. S.M. MOLINSKI,

                Defendants.

_____

**<u>ORDER</u>**

## I.    Status

Plaintiff, an inmate of the Florida penal system, initiated this case by filing a pro se Civil Rights Complaint (Doc. 1; Complaint). He is proceeding as a pauper. *See* Order (Doc. 5). On March 24, 2022, the Court dismissed all claims against Defendant Warden Lane. *See* Order (Doc. 6). Thus, the only remaining Defendants are Sgt. R. Molinski and Sgt. S.M. Molinski.[1]

Before the Court are the parties' cross motions for summary judgment. *See* Defendants' Motion for Summary Judgment (Doc. 34; Defendants' Motion);

---

[1] Robert Molinski and Suzzan Molinski are husband and wife, and they worked for the Florida Department of Corrections (FDOC) at the time of the incident alleged in the Complaint.

Plaintiff's Motion for Summary Judgment (Doc. 39; Plaintiff's Motion). Defendants filed a Response to Plaintiff's Motion (Doc. 42; Defendants' Response), and Plaintiff filed two responses to Defendants' Motion (Docs. 41, 43) and a Declaration (Doc. 41-1). The Motions are ripe for review.[2]

## II.    Complaint Allegations

Plaintiff alleges that on November 18, 2021, at Suwannee Correctional Institution, Sgt. R. Molinski and Officer McDonald "approached Plaintiff about an accusation of wrong-doing alleged by Sgt. S.M. Molinski." Complaint at 8. R. Molinski and McDonald escorted Plaintiff to confront S.M. Molinski, and Plaintiff "asked [her] why she was falsely accusing him of a rule violation (lewd and lascivious exhibition)." *Id.* "S.M. Molinski became irate and shouted to her husband, Sgt. R. Molinski, [who] immediately slammed Plaintiff to the pavement, jammed his knee into Plaintiff's back and put Plaintiff in a choke hold." *Id.* "Plaintiff gasped for air and pleaded for his life." *Id.* According to

---

[2] Plaintiff filed multiple requests for extensions of time to file a reply, which the Court granted. *See* Orders (Docs. 47, 50, 52). In its January 9, 2024 Order, the Court advised Plaintiff that no further extensions would be provided and the Court would consider the case ripe on January 18, 2024. *See* Order (Doc. 52). On January 18, 2024 (mailbox rule), Plaintiff filed another request for an extension of time (Doc. 53). Then on February 26, 2024 (mailbox rule), Plaintiff filed a motion for an extension of time to send preserved documents and letters to support his position on summary judgment (Doc. 54). Plaintiff's requests are due to be denied. Plaintiff has not shown that good cause or excusable neglect justifies an additional extension of time. Plaintiff was afforded more than 5 months to file a reply, and the Court advised him that no further extensions would be considered.

Plaintiff, he "was not combatant or resisting in any way," but "R. Molinski reacted with force at his wife's prompting and in anger because he felt Plaintiff had offended his wife." *Id.* at 9. Plaintiff further asserts that R. Molinski choked him and stated, "'N**ger, I don't give a damn about my job. I'll kill your black a**.'" *Id.* at 9. "At that point Captain Sullivan . . . entered the hallway, saw what was going on," and asked R. Molinski why he was there because he was supposed to be in N-Dorm. *Id.* Plaintiff claims that "Captain Sullivan ordered Sgt. R. Molinski to let go of Plaintiff and Plaintiff was taken to medical for a pre-confinement physical and then to confinement." *Id.* Plaintiff notes that he "was subsequently found not guilty of Sgt. S.M. Molinski's allegation against him." *Id.*

Plaintiff alleges that he "sustained structural and nerve damage to his neck," "psychological damage (anxiety, depression, paranoia, etc.)," and "persistent upper back pain." *Id.* at 7. He seeks monetary damages as relief. *Id.*

### III.   Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine when the evidence

is such that a reasonable jury could return a verdict in favor of the nonmovant. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

When the moving party has discharged its burden, the non-moving party must point to evidence in the record to demonstrate a genuine dispute of material fact. *Id.* Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."

4

*Anderson*, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing [the motion]." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (citing *Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1578 (11th Cir. 1994)). Additionally, a court should accept as true a pro se plaintiff's assertions in his verified complaint and sworn affidavit attached to his response. *See Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019).

"The principles governing summary judgment do not change when the parties file cross-motions for summary judgment. When faced with cross-motions, the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts." *T-Mobile S. LLC v. City of Jacksonville, Fla.*, 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008).

## IV.   Analysis of Defendants' Motion

Defendants make the following arguments in their Motion: (1) they are entitled to Eleventh Amendment immunity to the extent they are sued in their official capacities for monetary damages; (2) Plaintiff fails to state a claim against R. Molinski; (3) R. Molinski is entitled to qualified immunity; (4) Plaintiff fails to state a claim against S.M. Molinski; (5) Plaintiff is not entitled to compensatory damages; and (6) Plaintiff's nominal damages should be

reduced to $1. In support of their arguments, Defendants submitted a copy of Plaintiff's disciplinary report packet; declarations of both Defendants, Officer McDonald, Captain Sullivan, and Kellie Caswell; Plaintiff's medical records; an Inspector General's report and documentation; fixed wing and handheld videos; and a copy of Plaintiff's deposition.

In pertinent part, Defendant S.M. Molinski avers:

> On November 18, 2021, I was assigned as O-Dormitory housing officer at Suwannee Correctional Institution - Annex in Live Oak, Florida. At approximately 6:15 p.m., I was present in O-Dormitory's officer's station. During a visual scan of the dorm, I witnessed Inmate Black sitting in the dayroom, staring directly at me and masturbating. I informed the officers assigned to the wing of Inmate Black's behavior.

> Inmate Black was escorted out of O-Dormitory's dayroom and into the hallway next to the officer's station. Inmate Black approached the officer's station window flap and started yelling at me. I told the officers to get the inmate away from the window. After making the request, I then returned to my duties and did not pay any more attention to the officers or the inmates. I did not order Sergeant R. Molinski to take Plaintiff down.

> I did not witness Sergeant R. Molinski use force on Inmate Black. I was not standing near the window facing the incident and was on the phone with the control room continuing to perform my required duties.

However, even if I had witnessed the incident, I would not have been able to intervene. The officer's station where I was situated is enclosed with thick plexiglass windows and the door is on the opposite side of the window flap. In order to have physically intervened I would have had to leave the control room and pass through several solid security doors to enter into the wing. The process of leaving the security station would have taken several minutes.

Furthermore, I would not have been able to leave the station with the key until I was relieved by another officer. The door to the control room locks once the door is closed, and someone must be in the control room at all times. At most I could have made verbal statements but could not physically intervene in any altercation. I was not able to make verbal statements as I was not paying attention to what was going on outside of the control room since I had already reported the incident to the officers.

Doc. 34-2 at 2-3 (paragraph enumeration omitted).

Officer McDonald avers:

On November 18, 2021, I was assigned to O-Dormitory as a housing officer at Suwannee Correctional Institution - Annex in Live Oak, Florida.

At approximately 6:15 p.m., I received notice that Inmate Black was engaging in lewd and lascivious behavior. Sergeant R. Molinski and I subsequently escorted Inmate Black . . . out of O-Dormitory's dayroom and counseled him regarding an alleged rule violation for lewd and lascivious exhibition. I attempted to place him in a holding cell to put hand restraints through the door's flaps. However, Inmate Black refused to enter the holding cell and began to yell at Sergeant S. Molinski, who was

7

in the officer's station, through the glass windows. I gave Inmate Black a verbal order to submit to hand restraints and he refused to comply. I gave a second verbal order to Inmate Black to submit to hand restraints, and again, he refused. Inmate Black clenched his fists, and stated, "I'm not cuffing up."

Based on Plaintiff's actions, I stepped back and reached for my chemical agent cannister, however, before I could reach it, I saw Sergeant R[.] Molinski grab Inmate Black by his upper body and force him chest first to the floor. Sergeant R. Molinski's actions were taken to regain compliance of Inmate Black and to protect me from harm. Inmate Black was placed in hand restraints and Sergeant R. Molinski ceased all use of force. Subsequently, I placed leg restraints on Inmate Black and relieved Sergeant R. Molinski as I awaited further instructions.

I was instructed by Captain Sullivan to escort Inmate Black to P-Dormitory's holding cell in anticipation of a medical assessment. I assisted in the escort, and no further incident occurred during the escort. Once Inmate Black was secured in the holding cell in P-Dormitory, I returned to my assigned post.

I did not use force on Inmate Black. Additionally, the force utilized by Sergeant R. Molinski was done in response to Plaintiff's actions in an effort to regain compliance and protect me from being harmed. The use of force was not ordered by Sergeant S. Molinski. Sergeant R. Molinski did not utilize more force than was necessary under the circumstances.

Doc. 34-3 at 2-3 (paragraph enumeration omitted).

Defendant R. Molinski declares as follows:

8

On November 18, 2021, I was a Sergeant assigned as O-Dormitory's Housing Supervisor at Suwannee Correctional Institution - Annex in Live Oak, Florida. At approximately 6:15 p.m., I was present in O-Dormitory's sally port with Officer Alton McDonald as he counseled Inmate Black regarding an alleged rule violation by Inmate Black. We ordered Inmate Black to enter the holding cell to place him in hand restraints in order to transfer him to confinement. Inmate Black physically refused to enter the holding cell. Officer McDonald ordered Inmate Black to submit to hand restraints, however, Inmate Black refused to comply with Officer McDonald's orders. Inmate Black stated, "I'm not cuffing up," as he clenched his fists and stepped aggressively towards Officer McDonald. I observed Officer McDonald take a step back.

Based on Plaintiff's actions, I then proceeded to grab Inmate Black's upper torso and forced him chest first to the floor to regain compliance from Inmate Black and to prevent Officer McDonald from being harmed. Once Inmate Black was placed in hand restraints, all force ceased.

The force I used was the minimal amount of force needed to overcome Inmate Black's physical resistance to Officer McDonald's lawful commands. I did not otherwise harm Plaintiff and my actions were only taken based on the Plaintiff's actions.

After the incident, it is also my understanding that an Inspector General investigation was conducted, and it was determined that Plaintiff's claims were not supported by the evidence. No action was taken against me by FDC or the Inspector General as a result of the incident Plaintiff has sued me for.

Doc. 34-4 at 2-3 (paragraph enumeration omitted).

Defendants also submitted fixed wing and handheld camera footage. The fixed wing videos are from O dorm Q4 entrance; and P dorm Q4 entrance, stairs, showers, and SHAS. The O dorm camera is situated inside the dorm on the upper level, so it shows the officer station area where the incident occurred but the view is somewhat far away and obstructed. The timestamp at the start of the video is 6:15pm. Plaintiff and McDonald can be seen near the officer station, and someone can be seen inside the officer station at various times in the video, but it is unclear of their proximity to Plaintiff and what the person is doing.[3] Plaintiff is unrestrained and it appears that he has a tablet in one hand.[4] Plaintiff approaches the officer station and then backs away with his hands in the air as if he is questioning what is happening. He approaches the officer station again, and appears to be talking to McDonald. McDonald takes a step back and about 41 seconds after the video begins, R. Molinski appears and takes Plaintiff down to the ground. The three are then largely off camera and the video does not show what occurs once Plaintiff is on the ground. Approximately 5 minutes and 10 seconds after the takedown, Plaintiff is assisted to a sitting position.

---

[3] Based on the parties' assertions, the individual inside the officer station is most likely S.M. Molinski.

[4] It is unclear from the video whether Plaintiff has a bag of Doritos in his other hand.

The handheld camera footage begins at 6:28pm while Plaintiff is being escorted outside to a holding cell to await medical. While in the holding cell awaiting medical, Plaintiff states that he "was trying to see what the lady was talking about and so was y'all and he got mad." At 6:42pm, the first handheld camera was cut off because of a dead battery. The second handheld camera footage begins at 6:42pm and shows Plaintiff in the same holding cell discussing with officers what is going to happen to his property in his cell. At 6:43pm, he is taken into medical and assessed. At 6:54pm, Plaintiff exits medical and the camera does a front and back view of him to capture any visible injuries (none are shown). At 6:57pm, Plaintiff is secured in a cell. The handheld camera footage cuts out, but starts again moments later (the time was still 6:57pm) for Captain Sullivan to provide a closing statement noting that no injuries were documented. The handheld camera stopped recording at 6:58pm.

During Plaintiff's deposition, Plaintiff acknowledged that he was ordered to enter the "holding cage" but instead of doing so, he questioned the officers asking, "For what? What is going on?" Doc. 34-11 at 16. He explained, "I didn't know these officers. I didn't trust them. I didn't know what was going on." *Id.* Plaintiff continued:

"So this lady right here said you did something to her." And I said, "What lady?" And they said here. It can be seen on camera.

Officer McDonald, we go to the officer station to have a glass door and they can hear – she's in there drinking a Mountain Dew or fruit punch and she's not looking at me. She's looking the other way. "What is this? What are they talking about? Why do I have to go in the holding cage?" She don't say anything. I look at her husband. He puts his head down. He's standing six feet behind me. So she said that you disrespected her. Disrespected her?

I looked up in the booth. "Ma'am, excuse me, what is this dude right here, Mr. McDonald, talking about? And what is this other guy talking about?"

At this point in time, I don't know this is her husband. She don't say anything, ma'am. I don't know what she's talking about.

"She says that you masturbated on her." I said, "What?" I look in the booth. "Ma'am, did you tell them that? Ma'am, you got the wrong person. You didn't see my penis. I didn't - - I'm waiting in line to get the kiosk. I went to the water fountain. You must got the wrong dude."

She said, "You know what you did." I said, "You need to look in the quad and get the right man. You're accusing me of something. I did not do what she's talking about."

I turned around to the husband. This lady is lying on me. I said, "Listen, ma'am, can you please look in there and see if you can find the right guy? It's not me."

She stoops down to the hold, she screams to her husband, "What are you going to do, just stand there and look at him. Take him down now."

Just like that. I got - - I never heard a lady yell that loud. McDonald, his eyes got big, both of us spooked to death. We were not expecting that. Her husband, walks up to me, I got my tablet, the other hand has my Dorito[]s in it.

He takes me by my collar. He spin moves and slams me to the ground. I tell him I'm not resisting. I didn't do anything. He puts his knee in my back. He puts me in a choke hold. He got my spine in a U-shape backwards.

When he put me in a choke hold, he's shaking me like a Rottweiler or Pitbull or a small poodle. He said, "N*gger, I don't give a damn about my job. I'll kill your black a**." I said to him that I didn't do anything. I said, "I can't breathe. Help me. Let me go."

S[e]rge[a]nt Sullivan walks in and he says, "What are you doing? Get off of him right now. Let him go right now." I'm gasping for air. I'm crying now. I said, "I didn't do anything. I didn't do anything."

*Id.* at 16-18.[5]

---

[5] Although Plaintiff states in his Complaint that he was found not guilty of the lewd or lascivious disciplinary report, during his deposition, Plaintiff admitted that he was found guilty based on the officer's statement. Doc. 34-11 at 20-21. The disciplinary report packet confirms he was found guilty of lewd or lascivious exhibition. *See* Doc. 34-1.

Plaintiff's medical records show no identifiable injury was documented after the use of force. Doc. 34-5 at 13-14. Kelli Caswell, RN, BSN, reviewed Plaintiff's medical records and avers, in pertinent part, as follows:

> The Plaintiff alleges that on November 18, 2021, at approximately 6:30 pm, he was involved in a Post Use of Force (PUOF) incident that resulted in injuries. Mr. Black was examined by medical at 6:45 p.m. The PUOF occurrence was described as "The inmate was placed on the ground and placed in handcuffs." When Mr. Black arrived at medical for evaluation, he was ambulatory, alert, oriented, and responding to questions verbally. The documentation shows he had no complaints of pain and there were no injuries noted. Mr. Black was released to confinement and educated to return to sick call if needed. The diagram of Injury also documents that there were no injuries identified.

> The Plaintiff alleges that he has structural damage to his neck. Mr. Black has had an x-ray of his neck which does not indicate any acute structural damage. His x-ray documents degenerative disc disease which can be a normal process of ageing.

> The Plaintiff alleges that he has nerve damage to his neck. There is no indication in the medical records that Mr. Black has nerve damage to his neck.

> The Plaintiff alleges that he is receiving ongoing treatment for his neck. There is no evidence that Mr. Black is receiving regular treatment for his neck. He placed sick calls on December 22, 2021, and April 6, 2022, for complaints of neck and/or back pain. He was evaluated and treated with Ibuprofen, Tylenol, or a topical analgesic. The x-ray of his neck which shows degenerative disc disease can be a cause of chronic pain. Mr. Black has also been seen with sick calls for

14

back and neck pain on February 3, 2023, where he states his pain is "from an incident on 08/24/2022." There is documentation from August 24, 2022, where Mr. Black was seen by medical, and no injuries or complaints were noted during the exam. He was evaluated by medical again on February 27, 2023, where Mr. Black stated, "pain in lower neck and spine, I feel like I have a concussion from the incident on 08/24." Mr. Black was treated with Ibuprofen.

The Plaintiff alleges psychological damage including anxiety, depression, and paranoia. Mr. Black is classified as an S-3. This Mental Health Classification according to Health Services Bulletin (HSB 150.03.13) states that S-3 is described as showing moderate impairment in adaptive functioning due to a diagnosed mental disorder. . . .

Mr. Black is not on any medications for mental health currently. He is being regularly monitored for any mental health issues and there is no supporting evidence that the use of force event on November 18, 2021, has exacerbated his mental health diagnoses. Mr. Black has been diagnosed with hallucinations and unspecified psychosis. Mr. Black has also, at times, refused medications and Mental Health Evaluations.

Doc. 34-10 at 2-4 (paragraph enumeration omitted).

A. Eleventh Amendment Immunity

Defendants argue they are entitled to Eleventh Amendment immunity to the extent Plaintiff sues them in their official capacities for damages. *See* Defendants' Motion at 7-8. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit

15

in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. It is well-settled that, in the absence of consent, "a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Papasan v. Allain*, 478 U.S. 265, 276 (1986) (quotation omitted). The Eleventh Amendment also prohibits suits against state officials where the state is the real party in interest, such that a plaintiff could not sue to have a state officer pay funds directly from the state treasury for the wrongful acts of the state. *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999).

In *Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986) (internal quotations modified and footnote omitted), the Eleventh Circuit noted:

> It is clear that Congress did not intend to abrogate a state's eleventh amendment immunity in section 1983 damage suits. *Quern v. Jordan*, 440 U.S. 332, 340-45 (1979). Furthermore, after reviewing specific provisions of the Florida statutes, we recently concluded that Florida's limited waiver of sovereign immunity was not intended to encompass section 1983 suits for damages. *See Gamble v. Fla. Dep't of Health & Rehab. Serv.*, 779 F.2d 1509, 1513-20 (11th Cir. 1986).

Accordingly, in *Zatler*, the court found that the Secretary of the FDOC was immune from suit in his official capacity. *Id.* Thus, insofar as Plaintiff seeks

16

monetary damages from Defendants in their official capacities, the Eleventh Amendment bars suit. Defendants' Motion is due to be granted to the extent that Plaintiff requests monetary damages from Defendants in their official capacities.

B. Excessive Force – R. Molinski

Defendants argue that R. Molinski's use of force "was reasonable and necessary under the circumstances." Defendants' Motion at 8. Plaintiff argues that the force was wholly unnecessary because he was not ordered to cuff up, he did not take an aggressive stance toward McDonald, and he could not have clenched his fists because he was holding a tablet in one hand and a bag of Doritos in the other hand. *See* Doc. 43-1 at 5-7.

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. "In evaluating an excessive force claim, [courts] adhere to two equally important principles. The first is that unreasonable or unnecessary force does not necessarily constitute excessive force . . . . The second is that even though the Constitution does not require comfortable prisons, it does not permit inhumane ones." *Williams v. Radford*, 64 F.4th 1185, 1196 (11th Cir. 2023) (citations and quotations omitted). "Under the Eighth Amendment, force is deemed legitimate in a custodial setting if it is 'applied in a good-faith effort to maintain or restore discipline' and not

17

'maliciously and sadistically to cause harm.'" *Sears*, 922 F.3d at 1205 (quoting

*Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). "This standard requires a prisoner

to establish two elements – one subjective and one objective: the official must

have both 'acted with a sufficiently culpable state of mind' (the subjective

element), and the conduct must have been 'objectively harmful enough to

establish a constitutional violation.'" *Sconiers v. Lockhart*, 946 F.3d 1256, 1265

(11th Cir. 2020) (quoting *Hudson*, 503 U.S. at 8).

> In determining whether force was used
> "maliciously and sadistically," we consider: (1) "the
> need for the application of force"; (2) "the relationship
> between the need and the amount of force that was
> used"; (3) "the extent of the injury inflicted upon the
> prisoner"; (4) "the extent of the threat to the safety of
> staff and inmates" ["as reasonably perceived by the
> responsible officials on the basis of facts known to
> them"[6]; and (5) "any efforts made to temper the
> severity of a forceful response." *Cockrell v. Sparks*, 510
> F.3d 1307, 1311 (11th Cir. 2007) (quotation marks
> omitted). "Not only that, but we must also give a wide
> range of deference to prison officials acting to preserve
> discipline and security, including when considering
> decisions made at the scene of a disturbance." *Id.*
> (quotation marks and alteration omitted). The focus of
> our Eighth Amendment inquiry is on the nature of the
> force applied, not on the extent of the injury inflicted.
> *Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010).

---

[6] *Williams*, 64 F.4th at 1196.

*Sears*, 922 F.3d at 1205. Indeed, "[a] plaintiff who suffers only *de minimis* injury does not necessarily lack a claim for excessive force under § 1983. However, the resulting injuries can be evidence of the kind or degree of force that was used." *Charles v. Johnson*, 18 F.4th 686, 700 (11th Cir. 2021) (citations omitted). Nevertheless, "[u]nless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain[,] . . . the case should not go to the jury." *Whitley v. Albers*, 475 U.S. 312, 322 (1986).

R. Molinski avers that force was necessary "to overcome Inmate Black's physical resistance to Officer McDonald's lawful commands." According to R. Molinski, he witnessed Plaintiff refuse multiple orders to submit to hand restraints, clench his fists, and step aggressively toward McDonald. On the other hand, while Plaintiff acknowledges that he did not enter the holding cage when directed, he testified at his deposition that they were having a normal conversation, he was not ordered to cuff up, he did not act aggressively, and he could not have clenched his fists because he had items in his hands. Plaintiff further avers that R. Molinski aggressively slammed Plaintiff to the ground because S.M. Molinski yelled at R. Molinski to do so, and that after he was on the ground, R. Molinski placed him in a chokehold, bent him backwards, placed

his knee in Plaintiff's back, and shook him while using a racial slur and threatening to kill Plaintiff.

The video evidence does not clearly support or refute either side's position, and it is not the province of the Court on summary judgment to weigh the evidence or make credibility determinations. *See Sconiers*, 946 F.3d at 1263 ("Summary judgment is not a time for fact-finding; that task is reserved for trial."). While the evidence confirms that Plaintiff did not suffer a more than *de minimis* physical injury, "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins*, 559 U.S. at 38.

There are simply too many factual disputes for the Court to resolve this claim on summary judgment. Accordingly, Defendants' Motion is due to be denied to the extent it seeks entry of summary judgment on Plaintiff's Eighth Amendment claim against R. Molinski.

C. Qualified Immunity – R. Molinski

Defendants argue that R. Molinski is entitled to qualified immunity on Plaintiff's Eighth Amendment claim. *See* Defendants' Motion at 13-17. According to Defendants, "R. Molinski reasonably believed, based on his personal observations, that Plaintiff was going to attack Officer McDonald,"

and thus he was justified in using physical force to overcome Plaintiff's physical resistance to a lawful command. *Id.* at 15.

Qualified immunity shields government employees from suit in their individual capacities for discretionary actions they perform while going about their duties. The thought behind the doctrine is the "balanc[ing of] two important public interests: 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Davis v. Waller*, 44 F.4th 1305, 1312 (11th Cir. 2022) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Under the balance that qualified immunity strikes, "all but the plainly incompetent or those who knowingly violate the law" enjoy its protection. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To determine whether qualified immunity applies, [courts] engage in a burden-shifting analysis. *See Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). At the first step, the public-employee defendant must show that he was acting within the scope of his discretionary authority when he committed the challenged acts. Once the defendant does that, the burden shifts to the plaintiff, who must show that qualified immunity is not appropriate. *Id.* To do that, the plaintiff must establish two things: (1) the defendant violated a constitutional right, and (2) that constitutional right was "clearly established" at the time of the defendant's actions. *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022).

A plaintiff can show that a violation is "clearly established" in any of three ways: (1) by relying on a "materially similar decision of the Supreme Court, of this Court, or of the supreme court of the state in

which the case arose;" (2) by invoking "'a broader, clearly established principle [that] control[s] the novel facts' of the case;" or (3) by persuading [the court] that the officer's acts "so obviously violate[ ] th[e] [C]onstitution that prior case law is unnecessary." *Id.* (citation omitted). If a plaintiff proceeds under the first or second method, he must point to a court decision. *Id.* The second and third methods require "obvious clarity." *Id.* That is, the principle must be so apparent that, even without a case with similar facts to light the way, any competent officer would know that his conduct crossed the line. *See id.* In sum, the "clearly established" part of the qualified-immunity inquiry asks whether the law when the officer engaged in the challenged conduct gave him "'fair warning' that his conduct was unlawful." *Id.* at 921 (citation omitted).

Courts have "discretion to decide which of the two prongs of [the] qualified-immunity analysis to tackle first." *Ashcroft v. alKidd*, 563 U.S. 731, 735 (2011). And since a plaintiff must show both prongs to overcome qualified immunity, if the prong the court considers first is not satisfied, the court need not consider the other prong because the officer is entitled to qualified immunity, regardless. *Pearson*, 555 U.S. at 236.

*Brooks v. Miller*, 78 F.4th 1267, 1279-80 (11th Cir. 2023) (internal citations modified).

Here, there is no dispute that during the incident, Defendant R. Molinski was acting within the scope of his discretionary authority as an employee of the FDOC. Thus, the burden shifts to Plaintiff to show that R. Molinksi is not entitled to qualified immunity.

Considering the evidence presented in the light most favorable to Plaintiff,[7] the Court finds that R. Molinski is not entitled to qualified immunity. If a jury were to believe Plaintiff's version of events, the jury could reasonably find that R. Molinski violated Plaintiff's clearly established constitutional right to be free from cruel and unusual punishment. Indeed, according to Plaintiff, R. Molinski's reasons for using force were unjustified because Plaintiff did not resist any orders to submit to hand restraints and he did not take an aggressive stance toward McDonald. Instead, Plaintiff contends that R. Molinski aggressively slammed Plaintiff to the ground in response to his wife's (S.M. Molinski) direction to take Plaintiff down. After taking Plaintiff to the ground, Plaintiff asserts that the excessive force continued even though Plaintiff stated he was not resisting. "The basic legal principle is that once the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth and Fourteenth Amendments, and any abuse directed at the prisoner after he terminates his resistance to authority is an Eighth Amendment violation." *Williams v.*

---

[7] *See Hinson v. Bias*, 927 F.3d 1103, 1118 (11th Cir. 2019) ("As we have noted, we view all facts and draw all reasonable inferences in favor of the non-moving party when reviewing a summary-judgment ruling. This means that we normally take as true the testimony of the non-moving party and adopt his version of the facts in a qualified-immunity case.").

*Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991). Accordingly, R. Molinski's request for qualified immunity is due to be denied.

### D. Failure to Intervene – S.M. Molinski

Defendants contend that Plaintiff fails to show that Defendant S.M. Molinski failed to intervene in R. Molinski's use of force. Indeed, Defendants assert that S.M. Molinski did not witness the use of force, and even if she had, she was not in a position to physically or verbally intervene. *See* Defendants' Motion at 17-19; *see also* Doc. 34-2 at 3.

"'[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable for his nonfeasance.'" *Williams*, 64 F.4th at 1199 (quoting *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007))). Liability for failure to intervene "only arises when the officer is in a position to intervene and fails to do so." *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir. 2000).

The parties agree that S.M. Molinski was inside the officer station when the incident occurred. S.M. Molinski avers that she could not have left the officer station until another officer relieved her. Plaintiff has not presented any evidence to contradict S.M. Molinski's sworn statement that she was not in a position to physically intervene. Indeed, Plaintiff acknowledged during his deposition that when an officer is inside the officer station, they do not leave.

*See* Doc. 34-11 at 29 ("His wife [(S.M. Molinski)] was still in the booth. When you're in the booth, you don't leave the booth.").

Plaintiff, however, argues that the use of force occurred because S.M. Molinski told R. Molinski to take Plaintiff down, and thus, she should have verbally intervened to stop the use of force. *See* Doc. 43-1 at 9. However, S.M. Molinski avers that she did not witness the force. According to Plaintiff's allegations, R. Molinski took him to the ground chest down. And the video shows that when Plaintiff was being taken down, he was facing away from the officer station and once on the ground, his feet (rather than his head) were shown facing the officer station. Thus, Plaintiff was not in a position to see whether S.M. Molinski was watching.[8] Considering the evidence presented, even in the light most favorable to Plaintiff, the Court finds that Defendants' Motion is due to be granted to the extent it seeks summary judgment on Plaintiff's failure to intervene claim against S.M. Molinski.

---

[8] In one of Plaintiff's Responses he states that S.M. Molinski ran "away from the window flap as her husband . . . use[d] excessive force on Plaintiff, which she should have stayed right there and first tried to verbally instruct [R. Molinski] to get off of Plaintiff." Doc. 43-1 at 9. This would corroborate S.M. Molinski's statement that she did not witness the use of force.

E. <u>Compensatory Damages</u>

Defendants argue that Plaintiff's claim for compensatory damages is barred because Plaintiff did not receive a more than *de minimis* physical injury from the use of force. *See* Defendants' Motion at 19-24.

Pursuant to § 1997e(e), "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." To satisfy § 1997e(e), a prisoner must assert physical injury that is more than *de minimis*. However, the injury does not need to be significant. *See Thompson v. Sec'y, Fla. Dep't of Corr.*, 551 F. App'x 555, 557 (11th Cir. 2014) (citation omitted). Thus, a prisoner may not recover compensatory damages for mental or emotional injuries absent any physical injuries, but he may recover punitive and nominal damages without showing any physical injury. *See Hoever v. Marks*, 993 F.3d 1353 (11th Cir. 2021); *see also Ketchup v. Barr*, No. 21-10510, 2021 WL 3360959, at *2 (11th Cir. Aug. 3, 2021) (recognizing that "42 U.S.C. § 1997e(e) bars prisoners from seeking compensatory damages absent a showing of 'more than de minimis' physical injury but does not bar nominal damages." (quoting *Brooks v. Warden*, 800 F.3d 1295, 1307-08 (11th Cir. 2015)).

Plaintiff alleges that he "sustained structural and nerve damage to his neck," "psychological damage (anxiety, depression, paranoia, etc.)," and "persistent upper back pain." Complaint at 7. Defendants have shown, however, through Nurse Caswell's Declaration and Plaintiff's pertinent medical records, that he did not suffer a more than *de minimis* physical injury as a result of the use of force.

Plaintiff's medical records show that he was evaluated for pain in his neck and upper back on December 22, 2021, but no injuries were noted. Doc. 34-9 at 4; *see also id.* at 6 (noting that Plaintiff was "compla[in]ing of an old neck and back pain from Novem[b]er at times. Stated he wanted documentation for a lawsuit."). He was evaluated again on February 3, 2022, and March 3, 2022, for complaints of neck and back pain. Doc. 34-9 at 17, 23. Plaintiff was instructed to take ibuprofen or acetaminophen. *Id.*

On March 30, 2022, Plaintiff submitted a sick-call request complaining of pain in his lower neck, upper back, and lower back which began on November 23, 2021. Doc. 34-9 at 40. He also complained of pain in his feet and ankles that began one year prior. *Id.* Then on April 6, 2022, Plaintiff was seen by medical and he complained that he had back pain every day and could "barely get to the chow hall," and his "feet and ankles hurt when [he] walk[s]." Doc. 34-9 at 35. He reported that the pain began in November after he was

27

"slammed on the ground by an officer." *Id.* Plaintiff was prescribed a topical analgesic and ibuprofen. *Id.* at 35-36.

On April 20, 2022, medical staff examined Plaintiff due to his complaints of lower back pain and x-rays were ordered. *Id.* at 46. The x-rays of Plaintiff's lumbar spine showed "[n]o acute fracture, listhesis, or spondylolysis. There is minimal multilevel degenerative disc disease and facet arthropathy." *Id.* at 53. The x-rays of his cervical spine also showed no "acute fracture" but Plaintiff has "[d]egenerative disc disease . . . throughout the cervical spine." *Id.* at 55.

On August 24, 2022, Plaintiff was seen by medical staff but no injury was noted and Plaintiff denied any complaints. Doc. 34-9 at 127. On October 13, 2022, Plaintiff was scheduled for a follow-up examination to discuss his hemoccult results, neck pain issues, and results of his x-rays from April 2022. *Id.* at 139. On that day, Plaintiff indicated that he was still having neck pain "every now and then." *Id.*

Notably, prior to the use of force at issue in this case, on February 16, 2021, Plaintiff submitted an inmate request asking that medical staff get his records from an outside doctor who treated him for a back injury resulting from a car accident in 2016. *Id.* at 264. He stated that he had surgery on his "lower middle neck and lower middle back and had [his] nerve endings burned in [his] lower neck and lower back." *Id.* He indicated that he was trying to get a low

28

bunk pass "due to the fact that it hurts [his] neck and [his] back when [he has] to jump in and out of the top bunk at the age of 50 and having a neck and back injury recently." *Id.*; *see also id.* at 235 (sick-call request dated May 1, 2021, containing similar information about Plaintiff's car accident and prior back surgery, along with complaints of severe back pain), 265, 267, 268 (similar inmate requests dated April 18, 2021; July 18, 2021; and September 21, 2021, respectively).

After reviewing Plaintiff's medical records, Caswell opined that Plaintiff's x-ray of his neck does not indicate any acute structural damage, there is no indication in his medical records that he suffered nerve damage in his neck, nor is there any indication that he is receiving ongoing treatment for his neck. Notably, Caswell states that the degenerative disc disease in Plaintiff's neck can be a cause of chronic pain.

Plaintiff has neither addressed Defendants' argument in his Responses nor has he pointed to any evidence to refute his medical records or Caswell's Declaration which show that he did not suffer a more than *de minimis* physical injury as a result of R. Molinski's use of force. Thus, Plaintiff cannot recover compensatory damages. Therefore, Defendants' Motion is due to be granted to

the extent Plaintiff's claim for compensatory damages will be dismissed without prejudice.[9]

F. <u>Nominal Damages</u>

The portion of Defendants' Motion addressing nominal damages is clearly copied from another case. *See* Defendants' Motion at 24-25 (referring to "Defendant Inch" and plaintiff's request for "[n]ominal damages of $5,000" while citing to "Doc. 21 at 28," when Inch is not a defendant in this case, Plaintiff did not request $5,000 in nominal damages in his Complaint, and Doc. 21 is a 2-page notice advising the Court that Defendants complied with its Order). Thus, Defendants' Motion is due to be denied in that regard.

## V.   Analysis of Plaintiff's Motion

In Plaintiff's Motion, he lists facts that he claims are not in dispute, and then argues that he "has met his evidentiary burden [because] the preserved surveillance video provides undisputable proof that the force used on Plaintiff . . . was unnecessary, excessive, and unconstitutional." Plaintiff's Motion at 4. Defendants argue that Plaintiff fails to support his allegations with any evidence, and they attach a declaration from another inmate who

---

[9] This finding does not affect Plaintiff's claim for punitive damages.

states that when he was helping Plaintiff draft the Complaint, the inmate embellished the facts to avoid dismissal. *See generally* Defendants' Response.

Upon due consideration, the Court finds that Plaintiff's Motion is due to be denied. As explained above, the video evidence does not clearly show that the force used was unnecessary or unconstitutional. There are genuine issues of material fact that preclude entry of summary judgment. Thus, Plaintiff's Motion is due to be denied.

Accordingly, it is

**ORDERED**:

1. Plaintiff's Motion for Extension of Time (Doc. 53) and Motion for Extension of Time to Send Preserved Documentations/Letters of Communication Between Plaintiff and Any Witnesses (Doc. 54) are **DENIED**.

2. Defendants' Motion for Summary Judgment (Doc. 34) is **GRANTED in part and DENIED in part**. The Motion is **GRANTED** to the extent that Defendants are entitled to Eleventh Amendment immunity on Plaintiff's request for monetary damages from Defendants in their official capacities; Defendant S.M. Molinski is entitled to entry of summary judgment in her favor on Plaintiff's failure to intervene claim; and Plaintiff's request for compensatory damages is dismissed without prejudice. Judgment to that effect

is withheld pending adjudication of the remaining claim against R. Molinski. See Fed. R. Civ. P. 54.  The Motion is otherwise **DENIED**.

    3.      Plaintiff's Motion for Summary Judgment (Doc. 39) is **DENIED**.

    4.      Plaintiff and Defendant R. Molinski shall confer in good faith regarding settlement of the remaining claim. The parties are encouraged to maintain a realistic approach in making and considering any settlement offers. If the parties resolve the case, they shall expeditiously file a notice in compliance with Local Rule 3.09(a). If they are unable to settle the case, no later than **April 30, 2024**, Plaintiff and Defendant R. Molinski shall each file a notice advising whether a settlement conference with a United States Magistrate Judge may be beneficial.

    **DONE AND ORDERED** at Jacksonville, Florida, this 22nd day of March, 2024.

BRIAN J. DAVIS
United States District Judge

JAX-3 3/21
c:
Everette L. Black, Jr., #364497
Counsel of Record